## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

JOANN S. MOUNCE,         )
         )
      Plaintiff,       )
         )
     vs.          )       **Case No. 4:07CV1413 CAS**
         )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,   )
         )
      Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Joann S. Mounce for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 8). Defendant has filed a Brief in Support of the Answer. (Doc. No. 10). Plaintiff has also filed a Reply. (Doc. No. 11).

### Procedural History

On October 2, 2003, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on March 1, 2003. (Tr. 99-101). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 25, 2006. (Tr. 35-37, 26-34).

- 1 -

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA). (Tr. 69-72). On December 26, 2006, the Appeals Council remanded the case to an ALJ for further action. (Tr. 73-76). Following a hearing held on February 7, 2007, the ALJ found on March 14, 2007 that plaintiff had been under a disability since July 28, 2006, but not at any time prior thereto. (Tr. 15-25). Thus, this decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.   ALJ Hearing

Plaintiff's administrative hearing was held on February 7, 2007. (Tr. 376). Plaintiff was present and was represented by counsel. (Id.). Vocational expert Gary Weimholt was also present. (Id.). The ALJ admitted all of the exhibits into the record. (Id.).

The ALJ then examined plaintiff, who testified that she was 48 years of age and attended school through the sixth grade. (Tr. 377). Plaintiff stated that she has tried unsuccessfully to obtain her GED. (Id.). Plaintiff testified that she has worked as a waitress on and off since she was 21. (Tr. 378). Plaintiff stated that she never worked at a job for as long as six months at a time. (Id.).

Plaintiff testified that she was five feet, seven inches tall and weighed 206 pounds. (Id.). Plaintiff stated that her normal weight was 170 pounds and that she last weighed 170 pounds a year-and-a-half prior to the hearing. (Id.). Plaintiff testified that she experiences difficulty breathing due to the extra weight. (Tr. 379). Plaintiff stated that she has a "smashed disk" in her lower back. (Id.). Plaintiff testified that she experiences increased lower back pain due to the

added weight. (Id.).

Plaintiff stated that she drank in the past, although she did not consider herself an alcoholic. (Id.). Plaintiff testified that she did not have a history of IV drug use. (Id.). Plaintiff stated that she has hepatitis.[1] (Id.). Plaintiff stated that the hepatitis causes pain, makes her fingernails brittle, and causes her hair to fall out. (Id.).

Plaintiff testified that the smashed disk in her lower back causes her to experience pain in her lower back and in the right side of her hip. (Tr. 380). Plaintiff testified that the pain comes and goes. (Id.). Plaintiff stated that her back pain is increased when she reaches overhead. (Id.). Plaintiff testified that she also has arthritis[2] in her hands, which causes pain. (Id.).

Plaintiff stated that she has diabetes, which causes her to feel nervous and makes her shake. (Tr. 381). Plaintiff testified that she takes medication for her diabetes. (Id.). Plaintiff stated that the medication controls her diabetes. (Id.).

Plaintiff testified that she has psychological problems. (Id.). Plaintiff stated that she has bipolar disorder,[3] which causes her to experience severe mood swings. (Id.). Plaintiff testified that she saw a psychologist, Vincent Stock, in July of 2005. (Id.). Plaintiff stated that she has not received psychiatric care since she saw Mr. Stock. (Tr. 382). Plaintiff testified that she only receives psychiatric care at St. John's Mercy Clinic because she does not have insurance. (Id.). Plaintiff stated that she saw Dr. Garcia through the clinic a few weeks prior to the hearing. (Id.).

---

[1]Hepatitis is inflammation of the liver, due usually to viral infection but sometimes to toxic agents. Stedman's Medical Dictionary, 875 (28th Ed. 2006).

[2]Inflammation of the joints. See Stedman's at 159.

[3]An affective disorder characterized by the occurrence of alternating periods of euphoria (mania) and depression. Stedman's at 568.

Plaintiff testified that she also saw Dr. Raafea Malik through the clinic subsequent to seeing Mr. Stock. (Id.). Plaintiff stated that Drs. Garcia and Malik volunteer their time at the clinic so she is not able to see them often. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she gets "the shakes" with her diabetes when her blood sugar levels go up. (Tr. 383). Plaintiff stated that her doctors changed her medication in 2005. (Id.). Plaintiff testified that since her medication has been changed, she experiences the shakes about every other day. (Tr. 384). Plaintiff stated that the shakes last for about half an hour if she eats something. (Id.).

Plaintiff testified that she lies down and uses a heating pad or takes pain medication to decrease her back pain. (Id.). Plaintiff stated that she lies down due to back pain a few times a week for half an hour to 45 minutes. (Id.).

Plaintiff testified that she experiences anxiety, which causes her skin to break out in a rash on over sixty percent of her body. (Id.). Plaintiff stated that the rash is called neurodermatitis.[4] (Tr. 385). Plaintiff testified that this occurs all the time. (Id.). Plaintiff stated that she frequently becomes shaky due to anxiety. (Id.). Plaintiff stated that she is depressed every day, but some days are worse than others. (Id.). Plaintiff testified that she gets nervous. (Tr. 386). Plaintiff stated that she takes her medication when she becomes nervous. (Id.). Plaintiff testified that she experiences crying spells almost every day that last about an hour. (Id.). Plaintiff stated that she does not sleep at night. (Id.).

Plaintiff testified that she usually gets along with her family, although she frequently becomes upset. (Id.). Plaintiff stated that she commonly becomes upset and stays in her mother's

---

[4]A chronic skin lesion, localized or disseminated. See Stedman's at 1309.

bedroom when she visits with her family. (Id.). Plaintiff testified that her behavior affects her children and grandchildren because they do not like seeing her upset. (Tr. 387). Plaintiff stated that her son also has bipolar disorder. (Id.).

Plaintiff testified that she sleeps with a knife because she is afraid someone will come into her room. (Id.). Plaintiff stated that she occasionally has episodes where she feels that people are present when she knows they are not. (Id.).

The ALJ then re-examined plaintiff, who testified that she has not worked since 2001. (Id.).

Plaintiff stated that she saw Dr. Malik a number of times in 2004. (Id.). Plaintiff testified that she had a hard time getting in to see Dr. Malik in 2005. (Id.). Plaintiff stated that she saw doctors for physical complaints, including diabetes, in 2005. (Tr. 388). Plaintiff testified that she began seeing Dr. Garcia in 2006. (Id.).

The ALJ then questioned the vocational expert, Gary Weimholt. (Id.). The ALJ asked Mr. Weimholt to assume a hypothetical individual of claimant's age and background who can lift and carry up to twenty pounds occasionally and ten pounds frequently; sit for six hours out of an eight-hour workday; stand or walk for six hours out of an eight-hour workday; occasionally climb stairs and ramps; can never climb ropes, ladders, or scaffolds; can occasionally stoop, crouch, and kneel; pushing and pulling with the legs is limited to twenty pounds occasionally and ten pounds frequently; and is able to understand, remember and carry out at least simple instructions and non-detailed tasks. (Tr. 388-89). Mr. Weimholt testified that such an individual would not be able to perform plaintiff's past work as a waitress. (Tr. 389). Mr. Weimholt stated that the individual could perform other jobs, such as fast food worker, which is unskilled and 5,000 of such exist in

the state economy.  (Id.).  Mr. Weimholt testified that the individual could also work as a cleaner or maid and that there are 6,000 of such positions in the state economy.  (Tr. 390).

Plaintiff's attorney then examined Mr. Weimholt.  (Id.).  Plaintiff's attorney asked Mr. Weimholt to add the following limitations to the ALJ's hypothetical: presence of auditory hallucinations, paranoid ideations, and suicidal ideations.  (Id.).  Mr. Weimholt testified that the presence of these symptoms on a regular and continuous basis to the extent they would take away from attention and concentration and the ability to be present in the work place would preclude all jobs.  (Id.).

The ALJ then questioned Mr. Weimholt, who testified that a GAF score[5] of 40[6] would not be consistent with full-time employment.  (Tr. 391).

The ALJ indicated that he would leave the record open for thirty days so that plaintiff's attorney could submit records from Dr. Garcia.  (Id.).  The ALJ then encouraged plaintiff to seek more regular care with Dr. Garcia to help improve her symptoms.  (Tr. 392).

---

[5]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[6]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work).  DSM-IV at 32.

B.    **Relevant Medical Records**[7]

Plaintiff presented to Meacham Park Health Center on March 3, 2004.  (Tr. 195-96).  The

doctor noted that plaintiff had recently moved to St. Louis from Arizona, where she had been

diagnosed with schizophrenia.[8]  (Tr. 196).  Plaintiff complained of visual and auditory

hallucinations and active suicidal ideations.  (Id.).  It was noted that plaintiff had attempted suicide

in the past and had taken a butcher knife to bed to kill herself four days prior.  (Id.).  The doctor

diagnosed plaintiff with schizophrenia with active suicidal ideations and instructed plaintiff to

present to the emergency department for inpatient psychiatric care.  (Tr. 195).

On March, 5, 2004, it was noted that plaintiff was in good spirits.  (Tr. 194).

On March 8, 2004, it was noted that plaintiff's primary diagnosis was psychiatric and that

plaintiff needed to see a psychiatrist.  (Tr. 194).

On March 9, 2004, plaintiff complained of mood swings, thoughts of paranoia,

forgetfulness, auditory hallucinations, feelings of helplessness, and occasional suicidal thoughts.

(Tr. 329).  Plaintiff was diagnosed with bipolar disorder and was assessed a GAF of 45.[9]  (Id.).

On May 10, 2004, plaintiff presented to psychiatrist Raafea Malik.  (Tr. 261).  Dr. Malik

---

[7]Although plaintiff suffers from various physical impairments including hepatitis C, diabetes mellitus, degenerative disk disease, and obesity, plaintiff does not dispute the ALJ's findings with regard to these impairments.  Rather, plaintiff only challenges the ALJ's findings with regard to her mental impairments.  As such, the undersigned will discuss plaintiff's medical records only as they pertain to her mental impairments.

[8]A common type of psychosis, characterized by abnormalities in perception, content of thought, and thought processes (hallucinations and delusions) and by extensive withdrawal of interest from other people and the outside world, with excessive focusing on one's own mental life.  See Stedman's at 1729.

[9]A GAF score of 41-50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

noted that plaintiff reported an improvement in her mood and denied any auditory hallucinations or paranoid thoughts.  (Id.).

On February 8, 2005, plaintiff presented to Dr. Malik, at which time she denied any recent episodes of mania, denied any auditory/visual hallucinations, crying spells, and described social interactions as more comfortable.  (Tr. 317).  Dr. Malik prescribed Seroquel.[10]  (Id.).

On a March 10, 2005 office visit, it was noted that plaintiff has been diagnosed with bipolar disorder and schizophrenia and that plaintiff had had suicidal ideas in the past.  (Tr. 316). Plaintiff described herself as "doing well" and "in a good mood" at that time.  (Id.).  It was noted that plaintiff was being followed closely by psychiatry.  (Id.).  Plaintiff was found to be stable on Lithium,[11] Risperdal[12], and Seroquel.  (Id.).  Plaintiff was continued on her medications and was advised to follow-up with psychiatry.  (Id.).

Plaintiff saw Vincent F. Stock, a licensed psychologist, on July 21, 2005, for a psychological evaluation.  (Tr. 248-56).  A mental status examination revealed that plaintiff was agitated, labile in affect, depressed and anxious in mood, and normal in speech.  (Tr. 251). Plaintiff maintained poor to intermittent eye contact.  (Id.).  Plaintiff claimed to have auditory hallucinations twice a week from "dead people."  (Id.).  Plaintiff reported experiencing suicidal thoughts on a weekly basis and had a plan as well as the intention.  (Id.).  Plaintiff indicated that she depends on her husband for orientation about ninety percent of the time.  (Id.).  Plaintiff

---

[10]Seroquel is indicated for the short-term treatment of acute manic episodes associated with bipolar I disorder.  See Physician's Desk Reference (PDR), 662-63 (59th Ed. 2005).

[11]Lithium is indicated for the treatment of manic episodes of manic-depressive illness.  See PDR at 1485.

[12]Risperdal is indicated for the treatment of schizophrenia.  See PDR at 1743.

stated that her immediate and recent memory is impaired significantly.  (Id.).  Mr. Stock found

plaintiff's cognitive functioning to be limited as simple calculations, serial sevens and serial threes

were impaired.  (Id.).  Mr. Stock stated that plaintiff's judgment and insight were moderately

impaired.  (Id.).  Mr. Stock diagnosed plaintiff with bipolar disorder I,[13] severe with psychotic

features and assessed a GAF of 40.  (Id.).  With regard to plaintiff's activities of daily living, Mr.

Stock noted that plaintiff helps out by cooking on occasion, dusting, and going to the grocery

store; takes a bath every day; is confused through most of the day; goes to the clinic, sees her

doctors, and takes her medications as required; and her sleep is significantly interrupted.  (Tr.

252).  Mr. Stock stated that plaintiff's social interaction skills appear to be impacted by her

current mental status, although plaintiff reported going out with friends about once every two

weeks.  (Id.).  Mr. Stock found that plaintiff's ability to attend and concentrate appear to be

significantly impaired as simple calculations, serial sevens, and serial threes are impaired.  (Id.).

Mr. Stock noted that plaintiff has not worked since 2001 when she worked for a short time and

broke her leg.  (Id.).  Plaintiff reported that she does not believe that she can work due to her

physical and mental limitations.  (Id.).  Mr. Stock expressed the opinion that plaintiff is unable to

maintain a full-time position in employment because of her considerable mental and physical

limitations.  (Id.).

Plaintiff presented to David A. Lipsitz, Ph.D for a psychological consultation at the

request of the State agency on July 28, 2006.  (Tr. 270-73).  Plaintiff complained of hearing

voices that tell her to do certain things.  (Tr. 270).  Plaintiff stated that she feels that people are

---

[13]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes.  See Stedman's at 568.

following her, watching her, and out to get her. (Id.). Plaintiff described an incident in which she got a butcher knife because she was so paranoid and scared. (Id.). Dr. Lipsitz found that plaintiff appeared to be in some acute distress. (Tr. 272). He found some evidence of active psychotic process with auditory hallucinations, paranoid ideations, and possible delusional thought processes. (Id.). Plaintiff's affect was described as bright, although sometimes somewhat inappropriate. (Id.). Dr. Lipsitz found plaintiff's mood to be depressed with suicidal ideations and noted that plaintiff appeared to be potentially dangerous to herself. (Id.). He found plaintiff's intellectual functioning to be within the "low average" range. (Id.). Plaintiff also exhibited short-term memory problems. (Id.). Dr. Lipsitz found that plaintiff's concentration was good and her insight and judgment were fair. (Id.). He stated that plaintiff's thought processes were primarily preoccupied with her emotional volatility, her inability to do things as she once did and to function within society. (Tr. 273). Dr. Lipsitz diagnosed plaintiff with schizophrenia, paranoid type; and bipolar disorder. (Id.). He assessed a GAF of 40. (Id.). Dr. Lipsitz found that plaintiff had a marked limitation in her daily activities, moderate difficulties in maintaining social functioning, and mild deficiencies of concentration, persistence or pace. (Tr. 274). Dr. Lipsitz expressed the opinion that plaintiff was in need of ongoing psychiatric treatment geared primarily towards a combination of medication and individual psychotherapy. (Tr. 273).

### The ALJ's Determination

The ALJ made the following findings:

1.    The claimant met the disability insured status requirements of the Act on March 1, 2003, the date the claimant stated she became unable to work, and continued to meet them December 31, 2006.

2.    The claimant has not engaged in substantial gainful activity since March 1, 2003.

3.    The medical evidence establishes that the claimant has schizophrenia, bipolar disorder, obesity, and degenerative disk disease, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.    The claimant's allegations of symptoms precluding any work are found not credible until July 28, 2006, as they were not consistent with other evidence for the reasons specified in the body of this decision.

5.    Since March 1, 2003, the claimant has had the physical residual functional capacity to perform work involving lifting of up to twenty pounds, with no frequent lifting or carrying in excess of ten pounds. She can do work requiring a good deal of walking or standing, approximately six hours off and on during an eight hour work day, with the remaining time involving intermittent sitting. If sitting occurs most of the time there may be some pushing or pulling of arm or leg controls. She has additional nonexertional limitations in that she could only occasionally use stairs, ramps and could never use ropes, ladders, or scaffolds. She could only occasionally stoop, crouch, or kneel. Prior to July 28, 2006, the claimant had the mental residual functional capacity to understand, remember, and carry out repetitive, simple work instructions and non-detailed tasks. Since July 28, 2006, the claimant has been limited in her ability to interact with co-workers, supervisors, and the public. Furthermore, since that date, she has been severely limited in her ability to conduct the usual activities of daily living and, as needed, to engage in sustained work activity over a typical 8-hour workday. (20 CFR 404.1545 and 416.945).

6.    The claimant is unable to perform her past relevant work.

7.    For the period March 1, 2003, through July 27, 2006, the claimant's residual functional capacity for the full range of light work was further reduced by her inability to understand, remember, and carry out more than repetitive, simple work instructions and inability to perform more than non-detailed tasks.

8.    The claimant is 48 years old, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

9.    The claimant has a marginal education (20 CFR 404.1564 and 416.964).

10.   The claimant has no acquired skills, as demonstrated in previous work, which, considering her residual functional capacity, can be applied to meet the requirements of semi-skilled to skilled work activities of other work (20 CFR 404.1568 and 416.968).

11. Based on an exertional capacity for light work and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rule 202.17, Table No. 2, of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12. Although the claimant's nonexertional limitations did not allow her to perform the full range of light work during the period March 1, 2003, through July 27, 2006, using the above-cited rule(s) as framework for decisionmaking, there were a significant number of jobs in the national economy that she could perform. Examples of such jobs are fast food worker and general cleaner. Within the State of Missouri, there are 5,000 of the fast food worker positions and 6,000 of the general cleaner positions. Within the national economy, there are 50 times as many of each of these positions.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time during the period March 1, 2003, through July 27, 2006 (20 CFR 404.1520(f) and 416.920(f)).

14. Considering the claimant's additional nonexertional limitations within the framework of the above-cited rule since July 28, 2006, she cannot be expected to make a vocational adjustment to work that exists in significant numbers in the national economy.

15. The claimant has been under a "disability," as defined in the Social Security Act, since July 28, 2006, but not at any time prior thereto (20 CFR 404.1520(f) and 416.920(f)). Her disability can reasonably be expected to last twelve continuous months.

(Tr. 24-25).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application protectively filed on September 12, 2003, the claimant is entitled to a Period of Disability commencing on July 28, 2006, and to Disability Insurance benefits under sections 216(I) and 223, respectively, of the Social Security Act. Her disability can reasonably be expected to last twelve continuous months.

It is the further decision of the Administrative Law Judge that, as of the date of the application for Supplemental Security Income benefits filed on September 12, 2003, the claimant was disabled as defined in section 1614(a)(3)(A) of the Social Security Act, and that the claimant's disability has continued at least through the date of this decision. Her disability can reasonably be expected to last twelve continuous months.

The component of the Social Security Administration responsible for authorizing Supplemental Security Income payments will advise the claimant regarding the nondisability requirements for these payments, and if eligible, the amount and the month(s) for which payment will be made.

(Tr. 25).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

### B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.
See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.
 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his

or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure

must be followed at each level of administrative review.  See id.  Previously, a standard document

entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this

special procedure, had to be completed at each level and a copy had to be attached to the ALJ's

decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e),

416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required

is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a

(e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms,

findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."  20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erred in failing to follow the directions of the Appeals Council remand as to a medical expert.  Plaintiff next contends that the ALJ erred in failing to consider plaintiff's mental impairments as to the period prior to July 28, 2006.  Plaintiff finally argues that the ALJ improperly evaluated plaintiff's mental impairment and resulting functional

limitations.  The undersigned will address plaintiff's claims in turn.

**1.    ALJ's Compliance with the Appeals Council Order**

Plaintiff contends that the ALJ failed to comply with the Appeals Council Remand Order in that the ALJ did not obtain evidence from a mental health medical expert.  Defendant argues that Dr. Lipsitz's July 28, 2006 psychological evaluation satisfied the Appeals Council's directive.

The Appeals Council stated as follows in its December 26, 2006 remand order: "[t]he Administrative Law Judge *will* obtain evidence from a mental health medical expert to clarify the nature and severity of the claimant's impairment(s) (20 CFR 404.1527(f) and 416.927(f) and Social Security Ruling 96-6p)."  (Tr. 75) (emphasis added).

Although defendant contends that Dr. Lipsitz's July 28, 2006 evaluation satisfied the Appeals Council's directive, this argument lacks merit.  Dr. Lipsitz's evaluation occurred prior to the date the Appeals Council issued its remand order and was considered by the Appeals Council. In fact, the Appeals Council referred to Dr. Lipsitz's evaluation in its remand order and directed the ALJ to evaluate this evidence.  (Tr. 75).  It is clear from the language of the remand order that obtaining additional evidence from a mental health medical expert was mandatory.  The ALJ's failure to obtain such evidence violated the Appeals Council's directive.

**2.    ALJ's Evaluation of Plaintiff's Mental Impairment**

Plaintiff argues that the ALJ failed to evaluate her mental impairment as to the period prior to July 28, 2006.  Plaintiff also contends that the ALJ committed reversible error in failing to evaluate her mental impairment and resulting functional limitations as required by Social Security regulations.  Specifically, plaintiff argues that the ALJ disregarded the report of her treating psychiatrist in which she assessed a GAF of 45, and failed to give weight to the report of

psychologist Vincent Stock.

Although plaintiff claims that the ALJ failed to evaluate her mental impairment prior to July 28, 2006, the ALJ did discuss evidence from prior to July 28, 2006. Specifically, the ALJ discussed the July 2005 evaluation of Mr. Stock and indicated that he was assigning no weight to Mr. Stock's report. (Tr. 21). The ALJ also cited the treatment notes of plaintiff's treating psychiatrist, Dr. Raafea Malik, dated May 10, 2004, February 8, 2005, and March 10, 2005, in rejecting Mr. Stock's report. (Tr. 21).

Plaintiff next argues that the ALJ erred in evaluating the medical evidence regarding her mental impairment. In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be contrasted with the axiom that "[the opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). However, such opinions do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted

- 18 -

or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148.

Plaintiff saw Mr. Stock, a licensed psychologist, on July 21, 2005, for a psychological evaluation. (Tr. 248-56). A mental status examination revealed that plaintiff was agitated, labile in affect, depressed and anxious in mood, and normal in speech. (Tr. 251). Plaintiff claimed to have auditory hallucinations twice a week from "dead people." (Id.). Plaintiff reported experiencing suicidal thoughts on a weekly basis and had a plan as well as the intention. (Id.). Mr. Stock diagnosed plaintiff with bipolar disorder I, severe, with psychotic features and assessed a GAF of 40. (Id.). With regard to plaintiff's activities of daily living, Mr. Stock noted that plaintiff was confused through most of the day, and her sleep was significantly interrupted. (Tr. 252). Mr. Stock stated that plaintiff's social interaction skills were impacted by her current mental status. (Id.). Mr. Stock found that plaintiff's ability to attend and concentrate were significantly impaired as simple calculations, serial sevens, and serial threes were impaired. (Id.). Mr. Stock expressed the opinion that plaintiff was unable to maintain a full-time position in employment because of her considerable mental and physical limitations. (Id.).

In rejecting Mr. Stock's opinion, the ALJ first stated that Mr. Stock only saw plaintiff one time and that his evaluation was arranged by plaintiff's attorney for the purpose of aiding in the determination of possible Social Security benefits. (Tr. 21). The ALJ also stated that Mr. Stock's opinion is inconsistent with records from the Meacham Clinic, where plaintiff was receiving ongoing outpatient psychiatric treatment. (Id.). Specifically, the ALJ cited a May 10, 2004

treatment note of Dr. Malik in which she noted that plaintiff had felt improvement in her mood and denied any auditory hallucinations or paranoid thoughts. (Tr. 21, 261). The ALJ next noted that plaintiff denied any recent episodes of mania, denied any auditory/visual hallucinations, crying spells, and described social interactions as more comfortable on February 8, 2005. (Tr. 21, 317). The ALJ pointed out that on March 10, 2005, plaintiff described herself as "doing well" and "in a good mood." (Tr. 21, 316). Finally, the ALJ stated that Mr. Stock's opinion is inconsistent with Mr. Stock's own findings during the clinical interview, as plaintiff described her mood at the visit as "okay," and she made it to the interview by herself.

As plaintiff points out, the ALJ did not discuss plaintiff's March 9, 2004 office visit to Meacham Park Health Center, at which plaintiff was assessed a GAF of 45. (Tr. 329). Plaintiff complained of mood swings, thoughts of paranoia, auditory hallucinations, feelings of helplessness, and occasional suicidal thoughts at that time. (Id.). The ALJ also did not mention that plaintiff complained of visual and auditory hallucinations and active suicidal ideations on her March 3, 2004 office visit. (Tr. 196). Dr. Malik noted that plaintiff had attempted suicide in the past and had taken a butcher knife to bed to kill herself four days prior. (Id.). Dr. Malik diagnosed plaintiff with schizophrenia with active suicidal ideations and instructed plaintiff to present to the emergency department for inpatient psychiatric treatment. (Tr. 195). None of this evidence was discussed by the ALJ. This evidence is consistent with Mr. Stock's finding of a severe mental impairment causing significant limitations.

Mr. Stock's conclusions are also supported by his own findings during the clinical interview. Although plaintiff described her mood as "okay," a mental status examination revealed that plaintiff was agitated, labile in affect, and depressed and anxious in mood. (Tr. 250).

Plaintiff complained of auditory hallucinations occurring twice a week. (Tr. 251). Plaintiff reported experiencing suicidal thoughts on a weekly basis and had a plan as well as the intention. (Id.). In addition, Mr. Stock found that plaintiff's memory was significantly impaired, her cognitive functioning was limited, and her judgment and insight were moderately impaired. (Id.). These findings support the presence of a severe mental impairment with a GAF of 45. As such, the ALJ erred in assigning no weight to Mr. Stock's report.

After rejecting Mr. Stock's report, the ALJ found that plaintiff has been more limited beginning July 28, 2006, the date of Dr. Lipsitz's evaluation. (Tr. 21). The ALJ determined that prior to July 28, 2006, plaintiff had the mental residual functional capacity to perform work that did not require that she understand, remember or carry out more than simple, repetitive instructions or more than nondetailed tasks. (Tr. 22).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). See Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

The ALJ's mental residual functional capacity determination as to the period prior to July 28, 2006 is not supported by substantial evidence. The ALJ does not point to sufficient medical

evidence that supports his conclusions as to plaintiff's mental residual functional capacity prior to July 28, 2006. The medical evidence is indicative of a severe mental impairment causing significant limitations during this period. As discussed above, the ALJ improperly discredited the opinion of Mr. Stock regarding plaintiff's mental limitations. Notably, Mr. Stock's report is consistent with the opinion of Dr. Lipsitz, which is the basis of the ALJ's finding of disability for the period after July 28, 2006. Further, the ALJ did not obtain additional evidence from a mental health expert as directed by the Appeals Council, nor did he obtain source statements from plaintiff's treating physicians. Thus, there is not substantial medical evidence supporting the ALJ's determination when compared with contrary opinions expressed by Dr. Malik and Mr. Stock.

Accordingly, the undersigned recommends that the decision of the Commissioner be reversed and this cause remanded in order for the ALJ to determine whether plaintiff's mental impairments were disabling prior to July 28, 2006. The ALJ should consider all of the medical evidence in the record as to the period prior to July 28, 2006, assign the proper weight to the opinion of Mr. Stock, obtain additional evidence from a mental health expert as directed by the Appeals Council, and formulate a mental residual functional capacity based on the medical evidence in the record.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have eleven (11) days, until September 8, 2008, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this ___26th___ day of August, 2008.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE